**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                                                CASE NO.   6:09-bk-15238-KSJ

**TELLIGENIX CORPORATION,**                         **CHAPTER 11**

                              Debtor.
_____/


**DISCLOSURE STATEMENT**
**PURSUANT TO 11 U.S.C. §1125 FOR TELLIGENIX CORPORATION**




COUNSEL FOR DEBTOR

R. SCOTT SHUKER, ESQ.
VICTORIA I. MINKS, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
390 N. ORANGE AVENUE, SUITE 600
ORLANDO, FLORIDA, 32801




April 9, 2010

In re:                                          CASE NO. 6:09-bk-15238-KSJ

TELLIGENIX CORPORATION,                         CHAPTER 11

                    **Debtor.**

_____/

**DISCLOSURE STATEMENT**
**PURSUANT TO 11 U.S.C. §1125 FOR TELLIGENIX CORPORATION**

## I.      INTRODUCTION AND SUMMARY

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of §1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy case ("Bankruptcy Case") to make informed judgments about the Plan of Reorganization (the "Plan") submitted by Telligenix Corporation ("Telligenix" or "Debtor"). The Debtor is soliciting votes to accept the Plan. The overall purpose of the Plan is to provide for the restructuring of the Debtor's liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtor believes that the Plan provides the best means currently available for its emergence from Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtor, and thus strongly recommends that you vote to accept the Plan.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS**

ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTOR'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

Telligenix is a debtor under Chapter 11 of the Code in a bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court"). Prior to the Petition Date, ten entities were merged into Telligenix. The complete list of these entities which was attached to the Petition as Exhibit B-1 and Exhibit B-2, is attached hereto as **Exhibit "A."** An organizational chart is available upon request.

As prescribed by the Code and the Rules, Claims asserted against, and equity Interests in, the Debtor are placed into "Classes." The Plan contemplates consolidation of the unsecured claims, as further detailed in the Plan. Accordingly, the Plan contemplates six (6) separate classes of Claims and Interests. The classification of Claims and the treatment of each Class is discussed in detail below. A chart identifying the anticipated post-confirmation organizational structure of the Debtor is attached hereto as **Exhibit "B"** and is incorporated herein by reference.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtor are altered, modified or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired," and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

| <u>V</u>OTING <u>D</u>EADLINE |
|---|
| The last day to vote to accept or reject the Plan is _____, 2010. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day. |

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Court for its consideration. As described in greater detail in Section III of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Court will schedule a hearing (the "Confirmation Hearing") to consider whether Debtor has complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, Debtor has expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.    DESCRIPTION OF DEBTOR'S BUSINESSES

A.    In General.

In early October, 2009, the following entities were merged into Telligenix: American Cash Flow Corporation; TWG, LLP; Business Skills Corporation f/k/a Securities Trading Corporation; Dynetech Acquisition I, LLC; Dynetech Acquisition II, LLC; Dynetech Training & Simulation Corporation; Dynetech Services Corporation; Dynetech Corporation ("Dynetech"); MyMediaWorks.com Corporation ("MyMediaWorks"); and the B2G Group, Inc. and approximately 50 other fictitious entity names, as attached to Exhibit B-1 and Exhibit B-2 to the Petition (the "Debtor's Businesses"). The Debtor's Businesses were in the retail seminar business and offered the following services: (1) product management; (2) sales and marketing services; (3) live event management; (4) customer relations; and (5) technology development.

Dynetech was formed in July 2000 as an enterprise development and management company. Its fundamental business model was to partner with companies that wanted to bring their products or services directly to the marketplace. At its inception, Dynetech had an untested business model and no real revenue. However, by the end of 2002, the business had stabilized around three primary operating divisions: MyMediaWorks, which became an advertising agency; Saris Technologies, which became a web development company; and Telligenix, which became a training and development company.

Pursuant to its business model, Dynetech actively recruited clients ("Partner Clients") for its enterprise development business, the result of which, from 2002 through 2004, was a major expansion of the products and services which Dynetech, through various companies, offered to the general public.

In June 2004, Dynetech had the opportunity to acquire one of the Partner Clients, Globaltec Corporation ("Globaltec"), with which it had been involved for the prior three years, developing, marketing, and expanding its products throughout the United States and internationally. The acquisition of Globaltec provided Dynetech the opportunity to offer sophisticated financial decision analysis technology tools for the equities market, the foreign exchange market, the options market, as well as various search and scanning tools to identify appropriate trades in those asset classes.

Dynetech continued to expand its operations from that point until the middle of 2007, recording its best year in 2006, where it grossed $256 million in sales revenue with just under 600 employees and offices located in four states.

B.  Significant Developments and Events Leading to Chapter 11 Filing.

The operation of the Debtor's businesses was severely impacted by the following contributing factors between mid-June 2007 and the end of 2009.

1.  The Collapse of the Real Estate Market.  Beginning in the spring of 2007, weakness in residential real estate ultimately culminated in the collapse of the residential real estate market in September of 2007.  The impact on Dynetech was substantial, since a significant profit generator was the companies' activities in training for residential real estate development and residential real estate investment, as well as in providing tools for that marketplace.  As real estate values plummeted, revenue and ultimately profit from that segment of the Debtor's Businesses correspondingly plummeted.

2.  The Collapse of the Subprime and Conventional Mortgage Markets.  As the mortgage markets unraveled, so did other aspects of the Debtor's Businesses which related to training in financial instruments.  The collapse of the markets in probate investing, cash flow related investing, and note and mortgage related investing rendered these training activities unsupportable.

3.  The Collapse of the Financial Markets.  The fall of Bear Sterns and Lehman Brothers paralyzed the financial markets, further debilitating virtually all products associated with the Debtor's Businesses, including web-based tools, software products, and training programs.

4.  The Consumer Spending Decrease.  Virtually all consumer spending in the Debtor's Businesses stopped in October 2008 as consumers sharply reduced their spending in

response to the ailing economy. To the extent that the Debtor's fundamental process is direct to market distribution, it is, first and foremost, a retailer and suffered the same fate as other retailers. The reluctance of consumers to spend and invest, as well as the inability of consumers to borrow money, resulted in severe financial repercussions for the Debtor's Businesses.

5. <u>Financial Structure of the Debtor</u>. In addition to the external forces faced by the Debtor's Businesses, the Debtor's Businesses' financial structure faced difficulties. Dynetech purchased the entity, Globaltec, with seller financing and a promissory note which ballooned in December, 2005. All payments were made on time and the promissory note was refinanced on schedule, allowing Dynetech to pay Globaltec's sellers in full. However, the financial implications of the refinance were severe, replacing a low single-digit interest rate with a mid two-digit interest rate and a very aggressive pay down of the promissory note. While payments continued to be made in a timely manner throughout 2006 and 2007, the initial slow decline in the economy escalated to a rapid decline, resulting in the inability of Dynetech to keep its financing current. This inability, along with eroding business conditions and consumer spending, resulted in Dynetech being forced to dispose of the Globaltec asset, along with its substantial proprietary value, in the spring of 2009.

Secondly, Dynetech had originally entered into negotiations for rental of office space at Dynetech Centre at a time in which its employment was rapidly escalating and it had projected its Orlando-based employment to reach almost 600 employees within three years. As a result, it contracted for three floors of Dynetech Centre, as its named tenant. Subsequently, as construction delays occurred and the failing economy took a further toll, Dynetech became less

capable of handling its obligations under the Dynetech Centre lease. Nonetheless, Dynetech did move its offices into the Dynetech Centre in early 2009, releasing one floor from its lease with a payment of $1.5 million to the landlord and a monthly rental obligation of over $100,000.00 per month. The deterioration of the economy throughout 2009, as well as the financial conditions of the company, made continuation of that contractual arrangement no longer viable. Additionally, under its lease, Dynetech was required to provide improvements to the premises. Since it was no longer in a financial position to pay for those leasehold improvements, it provided a promissory note to the contractor, Turner Construction, to obtain those leasehold improvements. Again, as economic conditions eroded, Dynetech was no longer in a position to continue to make those payments. From 2007 through 2009, due to operational and macro-economic conditions, the Debtor was unable to secure any structured debt financing which would have assisted in providing liquidity.

6. <u>Litigation against the Debtor</u>. Upon acquisition of Globaltec, Dynetech assumed the responsibility for litigation that had been filed against Globaltec prior to Dynetech's acquisition of the company. This was a class action lawsuit which reflected claims about one of Globaltec's software programs, "4X Made Easy." Dynetech actively pursued settlement of that claim and favorably settled the claim by agreeing to perform services for the approximately 100 claimants and to pay the plaintiffs' attorney fees over time. Services for the claimants have been performed; however, the balance of the attorney fee payments has not yet been satisfied and is part of the Debtor's outstanding obligations. In addition, pursuant to the acquisition documents

for Globaltec, there is a claim for contribution from the sellers of Globaltec in the approximate amount of $1.5 million, which the Debtor intends to pursue.

Finally, on or about September 18, 2009, the State of Texas filed a Verified Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction against the Debtor and certain non-debtors (collectively, the "Defendants") in the case styled State of Texas v. B2G Venture, Inc. et al., in the Fifteenth Judicial District of the District Court of Harris County, Texas, cause number 2009-60031 (the "Texas Litigation"). The Texas Litigation sought to enjoin the Defendants from offering their products in Texas and further prohibiting them from conducting business anywhere in the state. In addition, the State of Texas placed levies on all bank accounts of the Debtor's Businesses. While the Debtor believes that there is no merit to the claim by the State of Texas, the net effect of this regulatory action by Texas was to trigger complete defaults at every level of the Debtor's Businesses.

In consideration of the Debtor's Businesses' struggles and the actions by the State of Texas, the Debtor and its affiliated entities decided that consolidation of the Debtor's Businesses and the reorganization under Chapter 11 was in the best interest of all parties.

Consequently, on October 8, 2009, (the "Petition Date") the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Middle District of Florida (Doc. No. 1). It is styled as: *In re Telligenix Corporation,* Case No. 6:09-bk-15238-KSJ.

C.      Events Subsequent to Chapter 11 Filing.

On October 9, 2009, the Debtor was granted an order authorizing it to operate its business as a debtor-in-possession under Section 1101(a) and 1108 of the Bankruptcy Code

10

(Doc. No. 12). On October 12, 2009, the Unites States Trustee formed the Official Committee of Unsecured Creditors (the "Committee") and, thereafter, the Committee hired the law firm of Broad and Cassel as counsel.

Pursuant to the various provisions of the Code, the Debtor has sought and obtained numerous orders from the Bankruptcy Court intended to facilitate the operations of the Debtor. On October 15, 2009, upon responding to Debtor's emergency motion, the Court entered an order addressing the effects of the asset freeze order in the Texas Litigation. (Doc. No. 24). The Court ordered that Wachovia Bank, N.A. ("Wachovia"), was to turnover to the Debtor the sum of One Hundred Thirteen Thousand Dollars ($113,000.00) (the "Funds") then held by Wachovia, pursuant to the Texas Litigation. The court further determined that, to the extent it determined that the Funds were derived from business conducted by the Debtor in the State of Texas, the State of Texas would have a super priority lien, under 11 U.S.C. § 507, on all assets of the Debtor to the extent of $113,000.00.

Additionally, prior to the Petition Date, TransFirst ePayment Services, Inc. ("TransFirst"), which provided merchant credit card payment processing services to the Debtor and the Debtor's Businesses, established a reserve account for the Debtor consisting of funds collected from the Debtor's customers' credit card transactions (the "Pre-Petition Reserve"), withholding the majority of the Debtor's operating income therein, post-petition. The Debtor and TransFirst came to an agreement, which was memorialized in an order by the Court entered on October 28, 2009 and provided, among other things, that any charge backs on processed transactions, whether the transaction occurred pre or post petition, may be offset first against post

11

petition collection; next against an "additional reserve" account, funded from twenty percent (20%) of payments made to the Debtor, processed through TransFirst (the "Additional Reserve"); and lastly, offset against the Pre-Petition Reserve. TransFirst was also ordered to transfer all post-petition funds (except for those constituting the Additional Reserve), to the Debtor. (Doc. No. 41).

Since the Petition Date, the Court also entered orders granting the Debtor's application for authority to compensate affiliate employee Laurence J. Pino (Doc. No. 42, 74, 82) (although Mr. Pino has not received compensation while the Debtor is under bankruptcy protection), and the Debtor's motion to pay pre-petition wages, salaries, and benefits, to reimburse pre-petition employee business expenses and to pay prepetition medical expenses (Doc. No. 44). On October 28, 2009, pursuant to Section 327 of the Bankruptcy Code, the Debtor sought and obtained an order from the Bankruptcy Court authorizing the Debtor to retain Latham, Shuker, Eden & Beaudine, LLP as Debtor's counsel (Doc No. 54).

On January 1, 2010, this court entered an order in response to a motion filed by Lincoln Orlando Holdings, LLC ("Lincoln"), the Debtor's landlord, requesting payment of post-petition rent pursuant to 11 U.S.C. §§ 105(a) and 365(d)(3) (the "Rent Motion") (Doc. No. 70) and the supplement to the Rent Motion (Doc. No. 85). The Court ordered that Lincoln shall have an allowed administrative claim in the amount of $288,684.86 (the "Lincoln Administrative Claim"); provided that the Official Committee of Unsecured Creditors (the "Committee") did not object. (Doc. No. 100). The Committee did not object to the claim. Subsequently, on January 11, 2010, the court entered an order granting the Debtor's motion pursuant to 11 U.S.C. § 365(a)

authorizing it to reject its unexpired real property lease with its landlord, Lincoln, as of December 31, 2009. (Doc. No. 107). On February 2, 2010, Lincoln filed its expedited motion for an order authorizing application of its security deposit, or, in the alternative, for relief from stay. (Doc. No. 131).

The Debtor currently has a motion pending with the court to sell property consisting of a URL (uniform resource locator, or address on the world wide web), free and clear of liens, which it filed on January 14, 2010. (Doc. No. 108). Such hearing is also set for March 24, 2010. This hearing will also address the Debtor's motion to reject certain unexpired equipment and non-residential property leases and executory contracts (Doc. No. 96).

On February 8, 2010, counsel for the Creditors' Committee filed a motion to extend the time to file a proof of claim until March 30, 2010. (Doc. No. 139). Also, on February 9, 2010, TR Crownepointe, LLC filed its motion, as landlord, for an order deeming its nonresidential property lease rejected and for immediate turnover of the leased premises pursuant to Section 365(d)(4). (Doc. No. 140). This motion was granted and an agreed order was entered on February 22, 2010, rejecting the lease and granting TR Crownepointe relief from the automatic stay if the Debtor fails to vacate the leased premises by February 28, 2010. (Doc. No. 156).

III.  **THE PLAN**

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF DEBTOR'S PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN. IN THE EVENT OF ANY INCONSISTANCIES BETWEEN THE PLAN AND THE**

**DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL.**

A.  Overview.

In summary, the Plan provides for the formation of the Creditors' Trust and Envergent Corporation ("Envergent"). The assets of the Creditors' Trust will consist of: (i) all of the Debtor's causes of action under 11 U.S.C. 544, et al. (the "Chapter 5 Causes of Action"); (ii) all of the Debtor's existing and potential causes of action including a malpractice action against Holland & Knight; (iii) all remaining liquidated personal property assets of the Debtor; (iv) any residual interest the Debtor has in the disposition of the Globaltech assets, pursuant to the applicable sale documents; (v) any residual interest the Debtor has in the disposition of the Optionetics assets, pursuant to the sale documents; (vi) a forty-nine (49%) interest in Envergent; and (vii) all remaining merchant account residual reserves from TransFirst, First Data (at SunTrust) and American Express. The assets of Envergent will consist of: (i) all of the intellectual property of the Debtor; (ii) the customer database of the Debtor; (iii) the "UltraTrade" name and its corresponding uniform resource locator ("URL"); (iv) all tangible personal property of the Debtor, for the use and benefit of Envergent. The remaining fifty-one (51%) of Envergent will be owned by a corporation as to which the beneficial owners will be prior equity owners of Debtor to the extent such owners contribute to the operations or management of Envergent or are otherwise affiliated thereto.

All Claims against the Debtor shall be classified and treated pursuant to the terms of the Plan. All interests in the Debtor will be extinguished.

As noted more fully below, the Plan contains six (6) Classes of Claims and Interests. There are four (4) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Equity Interests.

Overall, the Plan provides that Holders of Allowed Administrative Claims will be paid in full on the Effective Date. The only Priority Tax Claims also assert lien interests and, as such, the Claims are separately classified.

In full satisfaction of the allowed Priority Deposit Claims, pursuant to 11 U.S.C. § 365, the Debtor will assume and/or assign the contracts which form the basis of these claims to Envergent, keeping the Priority Deposit Claims Unimpaired.

Pursuant to Bankruptcy Code § 506, only the Holder of the Class 1 Claim will have an Allowed Secured Claim. The Allowed Class 1 Claim will be paid quarterly over sixty (60) months with interest at the Statutory Rate. All other Secured Claims, by virtue of valuation, are wholly unsecured and such will be included in Class 5.

B.    Classification and Treatment of Claims.

1.    Priority Claims.

a.    Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtor shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Court. However, nothing in this provision of the Plan shall preclude Debtor from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date provided that such Claim holder

consents to different payment terms. Debtor estimates that the asserted Administrative Claims to be approximately $350,000.00. This includes the allowed administrative claim of Lincoln Orlando Holdings, LLC ("Lincoln") in the amount of $288,684.86, which was granted pursuant to this court's order (Doc. No. 100) and all professional Claims. However, Debtor believes that the entire Allowed Administrative Claim of Lincoln will be satisfied through set off against the security deposit held by Lincoln.

       b.     <u>Priority Wage, Vacation, and Benefit Claims</u>.

The Priority Wage, Vacation and Benefit Claims consist of all Allowed Priority Wage Claims, which are defined as those unsecured Claims for wages, salaries or commissions, as described in § 507(a)(4) as well as for benefits delineated in § 507(a)(5). The Debtor estimates that the filed amount of Priority Wage, Vacation, and Benefit Claims is approximately $86,345.35. However, pursuant to the priority amount as set forth in Bankruptcy Code § 507, Debtor believes the Allowed Amount of Priority Wage Claims will be less than $20,000.00. To the extent any Allowed Priority Claim is unpaid as of the Effective Date, then such portion of the Allowed Amount of any such Claim shall be paid in full on either the Effective Date or the date on which such Priority Claim becomes allowed.

       c.     <u>Priority Tax Claims</u>.

The Debtor believes there are no Priority Tax Claims other than those secured by a lien and which are separately classified. However, if there are other Priority Tax Claims, each Holder of an Allowed Priority Tax Claim shall be paid over a period of five (5) years from assessment at the applicable Statutory Rate. Payments will be made quarterly.

d. Priority Deposit Claims.

The Priority Deposit Claims consist of all Priority Deposit Claims held by clients of the Debtor. In full satisfaction of the allowed Priority Deposit Claims, the Debtor will assume and assign to Envergent all of the contracts upon which the Priority Deposit Claims are based, rendering all Priority Deposit Claims unimpaired.

2. Secured Claims.

a. Class 1 – Orange County Tax Collector.

The Class 1 Claim consists of the Allowed Secured Claim of the Orange County Tax Collector, which is secured by a first priority Lien on the tangible personal property previously located at 111 N. Magnolia Avenue, Orlando, Orange County, Florida 34747 (the "Orange County Property"). In full satisfaction of its Allowed Class 1 Claim, Orange County shall retain its Lien on the Orange County Property and be paid its Allowed Secured Claim over five (5) years at the Statutory Rate. Payments will be made quarterly and commence on the first business day of the first calendar month after the Effective Date and continue each quarter thereafter.

b. Class 2 –Internal Revenue Service.

The Class 2 Claim consists of the Allowed Secured Claim of the Internal Revenue Service, which is secured by a Federal Tax Lien on all of the Debtor's property and rights to the property located in the State of Florida. In full satisfaction of its Allowed Secured Claim, the Internal Revenue Service shall retain its Lien and be paid over five (5) years at the Statutory Rate. Payments will be made quarterly and commence on the first business day of the first calendar month after the Effective Date and continue each quarter thereafter.

However, Debtor will soon be filing its 2009 tax return with substantial losses. Such losses will be offset against the Allowed Class 2 Claim. Thereafter, Debtor asserts that the only amounts owed will be for penalty assessments and, by virtue of Bankruptcy Code § 506, such amount will be entirely Unsecured and included within Class 5.

      c.      <u>Class 3 – Royal Bank of America Leasing, L.P.</u>

The Class 3 Claim consists of the Allowed Secured Claim of Royal Bank of America Leasing, L.P. ("Royal Bank"), which is secured by a lien against the equipment subject to the equipment lease agreement between the Debtor and Royal Bank. In full satisfaction of its Allowed Class 3 Claim, Royal Bank will receive return of their collateral as the indubitable equivalent of its Allowed Secured Claim.

      d.      <u>Class 4 – Energy Air, Inc.</u>

Because Energy Air, Inc.'s position is fully subordinate to that of the Orange County Tax Collector, the entire Claim of Energy Air, Inc., via Bankruptcy Code § 506, is unsecured. Accordingly, Energy Air, Inc., in full satisfaction of its Allowed Secured Claim, shall receive a Claim in Class 5 in an amount equal to the Allowed amount of its Claim.

      3.      <u>Unsecured Claims</u>.

      a.      <u>Class 5 – General Unsecured Claims</u>.

The Class 5 Claims consist of the Allowed Claims of all Unsecured Creditors including asserted Secured Claims which, by virtue of Bankruptcy Code § 506, will be entirely Unsecured. As of February 25, 2010, the Claims register for the Debtor showed approximately $16,096,983.37 in filed Unsecured Claims; however, on February 8, 2010, counsel for the Creditors' Committee filed a motion to extend the time to file a proof of

claim until March 30, 2010. (Doc. No. 139). Holders of Allowed Unsecured Class 5 Claims shall receive, in full satisfaction of their Allowed Unsecured Claims, on the Effective Date, a Pro Rata Share of the beneficial interests of the Creditors' Trust and, to the extent that the Creditors' Trust makes any distributions from and after the Effective Date, distribution(s) in Cash from the Creditors' Trust based on its Pro Rata Share of the Creditors' Trust.

The assets of the Creditors' Trust will consist of: (i) a forty-nine (49%) interest in Envergent; (ii) all remaining merchant account residual reserves from TransFirst, First Data (at SunTrust) and American Express; (iii) all of the Debtor's Chapter 5 causes of action; (iv) all of the Debtor's general causes of action; (v) all remaining liquidated personal property assets of the Debtor; (vi) any residual interest the debtor has in the disposition of the Globaltech assets, pursuant to the applicable sale documents; and (vii) any residual interest the Debtor has in the disposition of the Optionetics assets, pursuant to the sale documents.

On the Effective Date, each Holder of an Allowed Class 5 Claim will become a beneficiary of the Creditors' Trust, which will be directed by the Creditor Agent subject to the oversight of the Beneficiary Committee. A copy of the Creditors' Trust Agreement will be filed prior to the Confirmation Hearing. Each beneficiary of the Creditors' Trust will receive a Pro Rata Share of any distributions that may be made by the Creditors' Trust. On the Effective Date, each Holder of an Allowed Class 5 Claim shall be deemed to have permanently relinquished its rights to receive any payment or distribution from the Reorganized Debtor in respect of its Claim other than its distributions from the Creditors' Trust, as and to the extent provided in the Creditors' Trust Agreement. No distribution will be made to any Holder of a Disputed Claim, Any distributions to a Holder of a Disputed Claim shall be made if, when

and only to the extent such Disputed Claim is or becomes an Allowed Claim pursuant to a Final Order or by settlement or otherwise. To the extent Claims are Disputed Claims, the Debtor shall establish a reserve for Disputed Claims. Any person who holds both an Allowed Claim and a Disputed Claim will receive the appropriate distribution on the Allowed Claim, although no distribution will be made on the Disputed Claim until such dispute is resolved by settlement or Final Order.

        4.    <u>Class 6 - Equity Interests</u>.

Class 6 consists of all equitable interests in Telligenix. All currently issued and outstanding Equity Interests in the Debtor shall be extinguished on the Effective Date.

C.    <u>Means of Implementation</u>.

       1.    <u>Summary.</u>

The Plan contemplates six classes of claims. On the Effective Date, all of the prepetition equity in the Debtor shall be cancelled. The current class of Priority Deposit Claims will remain unimpaired.

       2.    <u>Funds Generated During Chapter 11</u>.

Funds generated from operations until the Effective Date will be used for operations and, thereafter, payments due on the Effective Date.

       3.    <u>Creditors' Trust</u>

a.    <u>Creation and Purpose of the Creditors' Trust</u>**.** The Creditors' Trust shall be created for benefit of Allowed Class 5 Creditors under the Plan and shall be governed by the terms of a Creditors' Trust Agreement. It is the Debtor's position that the Creditors' Trust should be exempt from registration as an investment company under §7 of the

Investment Company Act, as an entity engaged in transactions that are merely incidental to their dissolution. As set forth herein and in the Plan, the Beneficiary Committee will initially consist of the members of the Committee. Additionally, the Creditors' Trust is to exist solely for the payment of Allowed Claims through assignment of the following: (i) a forty-nine percent (49%) ownership of Envergent; (ii) all remaining merchant account residual reserves from TransFirst, First Data (at SunTrust) and American Express; (iii) all of the Debtor's Chapter 5 causes of action; (iv) all of the Debtor's general causes of action, without limitation, including a malpractice cause of action against Holland & Knight related to the Wizetrade transaction former equity owners of Debtor; (v) all remaining liquidated personal property assets of the Debtor not owned by Envergent; (vi) any residual interest the debtor has in the disposition of the Globaltech assets, pursuant to the applicable sale documents; and (vii) any residual interest the debtor has in the disposition of the Optionetics assets, pursuant to the sale documents.

Envergent will be owned 49% by the Creditors' Trust and 51% of Envergent will be owned by a corporation as to which the beneficial owners will be prior equity owners of Debtor to the extent such owners contribute to the operations or management of Envergent or are otherwise affiliated thereto. Envergent, in turn, will own; (i) all of the intellectual property of the Debtor; (ii) the customer database of the Debtor; (iii) the "UltraTrade" name and its corresponding uniform resource locator ("URL"); and (iv) all tangible personal property of the Debtor, for the use and benefit of Envergent. Envergent will also own approximately 30% of NewCo, which will pursue business opportunities to exploit the database by offering proprietary products and services. Although the exact agreements for NewCo have not been consummated, it is expected that 35% of NewCo will be owned by

venture capital investors and 35% owned by the holder of the intellectual property rights for the proprietary products and services.

The Creditors' Trust will enter into a Stock Redemption Agreement with Envergent, agreeing that, once 100% of all Allowed Claims are paid to the beneficiaries of the Creditors' Trust, the Creditors' Trust 49% interest in  Envergent will be redeemed and the Creditors' Trust will be terminated.  Additionally, each payment to the Creditors' Trust from any source will reduce, dollar for dollar, the amount necessary to redeem the ownership interest in Envergent.  Moreover, upon conclusion of Plan Payments to the Class 1 Claim, the interest of the Creditors' Trust will also be redeemed and vested back to Envergent.  The Creditors Trust (i) will not hold itself out as an investment company, but rather as a trust in the process of liquidation; (ii) will not conduct an active trade or business, and will limit any investments to temporary investments (i.e., short-term government securities); (iii) will be under the continuing jurisdiction of the Bankruptcy Court; and (iv) will terminate at some appointed future date, not to exceed five years from the Effective Date of the Plan, unless extended by the Bankruptcy Court.  The terms and conditions of the Creditors' Trust Agreement will be provided prior to the Confirmation Hearing**.**  The Creditors Trust Agreement will provide for, but not be limited to the following: (i) the transfer of the above-described assets to the Creditors' Trust will be treated for all purposed of the Internal Revenue Code as a taxable transfer to the Allowed Class 5 Creditors who are beneficiaries of the Trust; (ii) such transfer will be treated as a deemed transfer to the Allowed Class 5 Creditor-beneficiaries to the Creditors' Trust; (iii) the Allowed Class 5 Creditor-beneficiaries will be treated as grantors and deemed owners of the Creditors' Trust; (iv) the assets transferred to the Creditors' Trust on the Effective Date must be valued by

the Trustee and such valuations must be provided to the Debtor and Allowed Class 5 Creditor-beneficiaries and used consistently for all federal income tax purposes by the Debtor, Allowed Class 5 Creditor-beneficiaries and the Creditors' Trust; (v) all of the Creditors' Trust's income will pass-through to the Allowed Class 5 Creditor-beneficiaries annually, in accordance with IRC Section 671 and such income allocation will be based on the population of Allowed Class 5 Creditor-beneficiaries at the end of each calendar year. Except as otherwise provided in the Plan, effective as of the Effective Date, all Causes of Action shall be transferred to the Creditors' Trust to be asserted and prosecuted by the Creditors' Trust Agent (the "Creditor Agent"). From and after the Effective Date, the Creditor Agent and no other person shall be authorized to litigate any Causes of Action, Chapter 5 and otherwise. The Creditor Agent shall also be vested with all right, powers and benefits afforded a "trustee" under Sections 704 and 1106 of the Bankruptcy Code.

b.     Creditor Agent.  The Creditor Agent shall be deemed an agent of the Class 4 Creditors who may be entitled to receive distributions from the Creditors' Trust under the Plan. The Creditor Agent shall perform the duties and have the rights and obligations proscribed in the Creditors' Trust Agreement. The Creditor Agent will be selected by the Committee prior to the Effective Date.

The Debtor shall be authorized and directed to execute, deliver, receive and exchange on behalf of the Estate any and all documents necessary to effectuate the transfer of the trust assets to the Creditors' Trust on the Effective Date.

c.     Compensation for Creditor Agent.  The Creditor Agent shall be paid on a per hour basis plus actual out-of-pocket expenses, to be paid monthly from the trust

assets, pursuant to the Creditors' Trust Agreement, or on such other basis as he and the Beneficiary Committee may agree, including the formula set forth in Section 326 of the Bankruptcy Code applicable to a Chapter 7 trustee.

d.     <u>Removal of Creditor Agent</u>**.**  The Creditor Agent may be removed with or without cause upon a majority vote of the Beneficiary Committee.

e.     <u>Preservation, Prosecution and Defense of Causes of Action</u>.  On behalf of the Creditors' Trust, the Creditor Agent shall have the right to pursue any and all Causes of Action of the Debtor that will be transferred to the Trust, including all pending adversary proceedings, whether or not such causes of action have been commenced as of the Effective Date, and shall be substituted as the real party in interest in any such actions commenced by or against the Debtor, the Debtor's Estate or the Committee.  The Creditor Agent shall prosecute or defend, as appropriate, such actions through final judgment, any appeals deemed necessary and appropriate by the Creditor Agent and collection; provided, however, that the Creditor Agent shall be authorized at any point in any litigation (a) to enter into such settlements as the Creditor Agent deems to be in the best interest of creditors, subject to Bankruptcy Court approval after notice and a hearing in accordance with Bankruptcy Rule 9019; or (b) to abandon, dismiss and/or decide not to prosecute any such litigation if the Creditor Agent deems such action to be in the best interest of Creditors without Bankruptcy Court or other approval.  The Creditor Agent shall be subject to the direction of the Beneficiary Committee.

f.     <u>Retention of Professionals</u>**.**  The Creditor Agent and Beneficiary Committee may retain professionals, (whether or not such professionals were

engaged by the Debtor or any party in interest in the Debtor's Chapter 11 case) on such terms as the Creditor Agent deems reasonable, subject to the terms of the Creditors' Trust Agreement, without Bankruptcy Court approval, except that payments to the professionals for post-confirmation services and expenses shall be made in accordance with the Creditors' Trust Agreement.

g.      <u>Payment of Costs/Expenses</u>.

(i)      All costs and expenses and obligations incurred by the Creditor Agent in administering the Creditors' Trust and/or Plan or in any manner connected, incidental or related thereto shall be a charge against the Creditors' Trust, including but not limited to, payments to the Creditor Agent, members of the Beneficiary Committee and any attorneys, accountants, brokers or other professionals employed by the Creditor Agent or the Beneficiary Committee, together the "Post Confirmation Professionals"). The Creditor Agent, members of the Beneficiary Committee and the Post Confirmation Professionals shall submit copies of the complete invoices (with time records) to one another each month. Unless the Creditor Agent receives an objection to the correctness or reasonableness of any such costs, expenses or obligations, the Creditor Agent shall approve and direct payment within thirty days of receipt of the invoice.

(ii)      Any professionals retained by the Committee or the Debtor pursuant to 11 U.S.C. § 327 and 1103 need not submit applications to the Court for fees and expenses incurred during the period between the Confirmation Date and Effective Date pursuant to 11 U.S.C. § 330, and such shall be paid either by the Debtor or the Reorganized Debtor.

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES LAW AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE. IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF PLAN SECURITIES MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(B)(1) OF THE BANKRUPTCY CODE UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, THE DEBTOR ENCOURAGES EACH HOLDER OF A CLAIM OR INTEREST POTENTIALLY ENTITLED TO RECEIVE PLAN SECURITIES UNDER THE PLAN TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISOR(S) WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.**

E.      Other Provisions.

1.      Leases and Executory Contracts.

The Plan provides that the Debtor shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not rejected by such date, then such unexpired lease or executory contract shall be deemed rejected. It is the position of the Debtor that the executory contracts listed in the respective Schedules of

Executory Contracts filed pursuant to Rule 1007, are the only executory contracts to which any of the Debtors was a party on the Petition Date. The Plan also provides for the Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all Causes of Action and objection to Claims.

2.  Procedures For Resolving Disputed Claims

a.  Prosecution of Objections to Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtor shall have the exclusive right to make and file objections to all Claims. All Claims objections filed post-Confirmation related to Class 5 Claims will be administered and maintained by the Creditors' Trust. All objections commenced prior to Confirmation Date shall be finished by the Reorganized Debtor.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be Filed with the Court and served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Confirmation Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the commencement of the Chapter 11 Case, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Debtor and the Creditors' Trust/Creditor

Agent shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtor had immediately prior to the commencement of the Chapter 11 Case as if the Chapter 11 Case had not been commenced.

b. Estimation of Claims

Pursuant to the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c. Cumulative Remedies

In accordance with the Plan, all of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim or Equity Interest becomes an Allowed Claim, such Claim shall be

treated as a Disputed Administrative Claim, Disputed Claim or Disputed Equity Interest for purposes related to allocations, Distributions, and voting under the Plan.

d.   Payments and Distributions on Disputed Claims

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Reorganized Debtor's Cash and Assets, such that the Holder of such Allowed Claim receives all payments and Distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question.  Except as otherwise provided in the Plan, no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order.  Unless otherwise agreed by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a Distribution until such dispute is resolved by settlement or Final Order.

e.   Allowance of Claims and Interests

(i).   Disallowance of Claims

According to the Plan, all Claims held by Entities against whom the Debtor has obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such

time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to the Debtor.

(ii). Allowance of Claims

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Chapter 11 Case, unless and until such Claim or Equity Interest is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim or Equity Interest.

f. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

3. Effect of Confirmation

a. Cancellation of Equity. On the Effective Date, all of the Debtor's outstanding Preferred and Common Stock, Partnership Interests, Membership Interests and other Interests will be extinguished.

b. Authority to Effectuate the Plan. Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the

Bankruptcy Court. The Confirmation Order will act as an order modifying the Debtor's by-laws such that the provisions of this Plan can be effectuated. Envergent and the Creditor Agent shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

c. <u>Post-Confirmation Status Report</u>. Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtor will file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, the Creditor Agent, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

d. <u>Escrows</u>. Pursuant to the Plan, all escrows previously established in the Chapter 11 Case and still in existence on the Effective Date will continue to be administered, and the escrowed funds shall be released, according to their terms and any orders of the Bankruptcy Court previously entered or this Plan. Escrowed funds that are released to the Reorganized Debtor after the Effective Date will be used to achieve Consummation and carry out the Plan.

4. <u>Dissolution of Creditors' Committee and Creation of Beneficiary Committee</u>

a. <u>Dissolution of Creditors' Committee</u>**.** As of the Effective Date, or as soon as practical thereafter, the duties of the Committee and any professionals retained by the Creditors' Committee in this case shall terminate except as to: (i) applications under Section 330 and 503 of the Bankruptcy Code and the Creditors' Committee's objections to such

application; and (ii) enforcement of the provisions of the Plan until the Plan is substantially consummated. On the Effective Date, the Creditor Agent shall be substituted in place of the Creditors' Committee in any legal proceedings in which the Creditors' Committee is a named party and shall have all rights and duties of the Creditors' Committee in such proceeding. No further action between the Creditor Agent and Creditors' Committee shall be necessary to effectuate such transfer.

        b.      <u>Creation of Beneficiary Committee</u>**.** As of the Effective Date, a Beneficiary Committee shall be created, which shall consist of the three (3) members. The initial members shall be the members of the Committee. In order to be eligible to become, or to continue as a member of the Beneficiary Committee, an individual must be a Creditor with an Allowed Class 5 General Unsecured Claim or be designated by any such Creditor. Any Beneficiary Member may withdraw from the Beneficiary Committee by sending written notice of withdrawal to the other members of the Beneficiary Committee and Creditors Agent Service List. Any member who withdraws or is otherwise not able to continue serving will be replaced by the Creditors who designated such member.

        The Beneficiary Committee shall have overall direction and control of the Creditors' Trust. The Beneficiary Committee shall oversee all of the activities of the Creditor Agent. The Beneficiary Committee shall have the powers and duties provided in the Plan and Creditors' Trust Agreement and shall not be governed by the United States Trustee's office.

**IV. CONFIRMATION**

    A.    <u>Confirmation Hearing</u>.

        Section 1128 of the Code requires the Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

        Counsel for the Debtors:

            R. Scott Shuker, Esquire
            Latham, Shuker, Eden & Beaudine, LLP
            390 N. Orange Avenue, Suite 600
            Orlando, Florida  32801

        Debtors:

            Telligenix Corporation
            Laurence J. Pino
            P.O. BOX 2228
            Orlando, Florida 32802-2228

        Official Committee of Unsecured Creditors:

            Roy S. Kobert, Esq.
            Broad & Cassel
            P.O. BOX 4961
            Orlando, Florida 32802

        United States Trustee:

            135 West Central Blvd.
            Suite 620
            Orlando, Florida 32801

B.    Financial Information Relevant to Confirmation.

Debtor has not yet completed a liquidation analysis ("Liquidation Analysis") or financial projections.  Debtor will complete such items prior to a hearing on the Disclosure Statement and separately file such with the Court.  Thereafter, the financial projections will be attached as **Exhibit "C"** and liquidation analysis attached as **Exhibit "D"** to the Disclosure Statement sent to Creditors as part of the Solicitation Package.

C.    Confirmation Standards.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code.  Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met.  The Debtor believes that the Plan satisfies all of the requirements for Confirmation.

1.    Best Interests Test.

Before the Plan may be confirmed, the Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain

under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtor believes that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if the Debtor were liquidated, the Court must determine how the assets and properties of the Debtor would be liquidated and distributed in the context of a Chapter 7 liquidation case.

Debtor's costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by Debtor during the Chapter 11 Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would eliminate the possibility that Unsecured Creditors and holders of Equity Interests would receive any distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Debtor has carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

a. the possible costs and expenses of the Chapter 7 trustee or trustees;

b. the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtor's assets caused by the forced Chapter 7 liquidation; and

c. the possible substantial increase in Claims which would rank prior to or on a parity with those of Unsecured Creditors.

2. <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor unless the liquidation is proposed in the Plan. As reflected in **<u>Exhibit "C"</u>**, the Debtor believes that core operations will generate sufficient cash flow to make all Plan Payments as noted herein. Based upon the financial projections, the Debtor asserts that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3. <u>Acceptance by Impaired Classes</u>.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4. Confirmation Without Acceptance by all Impaired Classes; "Cramdown."

The Code contains provisions that enable the Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**DEBTOR BELIEVES THAT, IF NECESSARY, IT WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.    <u>Consummation</u>.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Court, the Effective Date occurs, and the Reorganized Debtor and applicable parties reach agreement on any required documents. It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.    <u>Exculpation from Liability</u>

The Debtor, the Reorganized Debtor, The Creditor Agent, their respective members, Managers, and executive officers, and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the

Reorganization Case; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtor, the Creditor Agent, and their respective agents have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law, or any agreement, including the Post Confirmation Credit Facility. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Debtor's members, managers or executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

F.       <u>Police Power</u>.

Nothing in this Article VII shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtor for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to Section 1141 of the Code.

7.       <u>Revocation and Withdrawal of this Plan</u>.  The Debtor reserves the right to withdraw this Plan at any time before entry of the Confirmation Order.  If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

8.       <u>Modification of Plan</u>.  The Debtor may seek to amend or modify this Plan in accordance with § 1127(b) of the Bankruptcy Code, or remedy and defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtor may issue, execute, deliver or file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## V.     **ALTERNATIVE TO THE PLAN.**

If the Plan is not confirmed and consummated, Debtors believe that the most likely alternative is a liquidation of the Debtors under Chapter 7 or 11 of the Code.  In a liquidation or sale, Debtors believe the deficiency claims from the secured lenders could be as much as $5,243,141.90, and, as such, the pool of Allowed Unsecured Class 6 Claims would be increased and the dividend to such group eliminated.  Debtors believe that liquidation of all real and personal property in a Chapter 7 scenario would eliminate any possibility of recovery by Creditors.  In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of Debtors for distribution to Creditors in accordance with the priorities established by the Code.  Debtors' analysis of the probable recovery to Creditors and Holders of Equity Interest is set forth in the Liquidation Analysis.

## VI.     **CONCLUSION.**

The Debtor recommends that holders of Claims and Interests vote to accept the Plan.

**DATED** this 9th day of April 2010 in Orlando, Florida.

_/s/ R. Scott Shuker_____
R. Scott Shuker
Florida Bar No: 984469
Victoria Minks
Florida Bar No. 0064388
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
3900 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407-481-5800
Attorneys for Telligenix Corporation

**TELLIGENIX CORPORATION**


**DISCLOSURE STATEMENT COMPOSITE EXHIBIT A**

## TELLIGENIX CORPORATION
### (fka Life Skills Corporation)

## Entities Merged into Telligenix Corporation on 10/05/09

| Corporation | Incorporation State | FEIN |
|---|---|---|
| American Cash Flow Corporation | Florida | 59-3661083 |
| Business Skills Corporation, as of 09/09 fka Securities Trading Corporation | Florida | 59-3621642 |
| Dynetech Acquisition I, LLC | Florida | 20-1244041 |
| Dynetech Acquisition II, LLC | Florida | 20-1244080 |
| Dynetech Corporation | Florida | 59-3675537 |
| Dynetech Services Corporation | Florida | 75-3205972 |
| Dynetech Training & Simulation Corporation, as of 05/09 fka Business Skills Corporation | Florida | 61-1425195 |
| MyMediaWorks.com Corporation | Florida | 59-3633917 |
| The B2G Group, Inc | Florida | 80-0407831 |
| TWG, LLP | Texas | 75-2858485 |

## TELLIGENIX CORPORATION
### (fdba Life Skills Corporation)

### Fictitious Names Registered in the State of Florida

| ACTIVE | CANCELLED |
|---|---|
| Deal Maker Pro – FL | Institute of Commercial Real Estate – FL |
| Robert Allen Association – FL | National Probate Institute – FL |
| Internet Marketing Institute – FL | American Earning Institute – FL |
| Institute of Commercial Real Estate – FL | National Foreclosure Institute – FL |
| International Factoring Institute – FL | International Factoring Institute – FL |
| National Foreclosure Institute – FL | Jordan Goodman Institute – FL |
| National Probate Institute – FL | One Minute Millionaire Institute – FL |
| National Mortgage Institute - FL | B2G Institute - FL |
| Discovering Foreclosure Profits - FL | Adam Ginsberg Institute - FL |
| Robert Allen Institute - FL | Robert Shemin Institute - FL |
| | Marshall Sylver Institute – FL |
| | Discovering Foreclosure Profits – FL |
| | Institute for Commercial Real Estate – FL |

### fdba AMERICAN CASH FLOW ASSOCIATION, INC.

| ACTIVE | CANCELLED |
|---|---|
| None | American Cash Flow Journal – FL |
| | American Cash Flow Institute – FL |
| | B2G Institute – FL |

### fdba AMERICAN CASH FLOW CORPORATION

| ACTIVE | CANCELLED |
| --- | --- |
| American Cash Flow Association – FL,TX | B2G Institute – FL |
| American Cash Flow Institute – FL, TX, NV | American Cash Flow Institute - FL |

### fdba THE B2G GROUP, INCORPORATED

| ACTIVE | CANCELLED |
| --- | --- |
| B2G – FL | None |

### fdba BUSINESS SKILLS CORPORATION
### (fdba Securities Trading Corporation)

| ACTIVE | CANCELLED |
| --- | --- |
| 4X Made Easy – NV, Manitoba | |
| CommandTrade – NV | |
| Commodities Made Easy – NV, Manitoba | |
| Optionetics  - NV, Manitoba | |
| Options Made Easy – NV | |
| The Financial Center – FL | |
| Securities Trading Institute – FL | |
| Wizetrade – NV, Manitoba | |
| Wizetrade Commodities – NV, Manitoba | |
| Wizetrade Forex – NV, Manitoba | |
| Wizetrade Options – NV | |
| Wizetrade Stocks – NV, Manitoba | |

### fdba DYNETECH CORPORATION

| ACTIVE | CANCELLED |
| --- | --- |
| Dynetech – FL | None |

<u>**fdba DYNETECH ACQUISITIONS I, LLC**</u>

**None**

<u>**fdba DYNETECH ACQUISITIONS II, LLC**</u>

**None**

<u>**fdba DYNETECH SERVICES CORPORATION**</u>

<u>**fdba TWG, LLP**</u>

| <u>**ACTIVE**</u> | <u>**CANCELLED**</u> |
|---|---|
| GlobalTec – TX | None |
| Wizetrade TV - TX | |

<u>**fdba DYNETECH TRAINING & SIMULATION CORPORATION**</u>
**(fdba Business Skills Corporation)**

| <u>**ACTIVE**</u> | <u>**CANCELLED**</u> |
|---|---|
| Carleton H. Sheets Real Profit$ Real Estate Training program – NV | International Factoring Institute - FL |
| Discovering Foreclosure Profits - NV | Discovering Foreclosure Profits - FL |
| Institute of Commercial Real Estate – CA, NV, Manitoba | Institute of Commercial Real Estate - FL |
| Adam Ginsberg Institute – FL, NV | B2G |
| American Grants Institute – FL, NV, CA, MO, TX | Internet Marketing Institute - FL |
| International Finance Institute – FL, NV, TX | Kessler Real Estate Institute - FL |
| Internet Marketing Institute – CA, NV | National Probate Institute - FL |
| J.G. Banks Institute -  FL, NV | Quick Turn Real Estate Academy, FL, MO |
| Life Success Academy – CA, TX, FL, MO, NV | Robert Allen Institute – MO, FL |
| Market Place Pro – FL | National Mortgage Institute - FL |

National Foreclosure Institute – NV

National Mortgage Institute – TX

National Probate Institute –NV, Manitoba

Quick Turn Real Estate Academy – TX

Robert Allen Institute – CA, NV, TX,
Manitoba
Texas Business Skills Corporation  - TX

Xvest – FL

Xvest Institute – FL

Business Skills' Financial Power Summit
– BC
Financial Power Summit
– Manitoba
Business Skills' Commercial Real Estate
– BC, Ontario
Business Skills' National Probate
–BC, Ontario


## fdba MYMEDIAWORKS.COM CORPORATION

| **ACTIVE** | **CANCELLED** |
|---|---|
| Dynetravel – FL | None |
| MyMediaWorks – FL | |